**UNITED STATES**

v.

**Kevin P. McGEENEY, 456 79
7065, Corporal (E–4), U.S.
Marine Corps.**

**NMCM 93 00228.**

U.S. Navy–Marine Corps Court of
Criminal Appeals.

Sentence Adjudged 11 Jan. 1992.

Decided 27 Oct. 1994.

LT Philip Sundel, JAGC, USNR, Appellate Defense Counsel.

LT Darryl G. Geary, JAGC, USNR, Appellate Defense Counsel.

Maj Laura L. Scudder, USMC, Appellate Government Counsel.

LT Scott A. Browne, JAGC, USNR, Appellate Government Counsel.

Before MOLLISON, Senior Judge, and CLARK and DeCICCO, JJ.

DeCICCO, Judge:

Contrary to his pleas, a general court-martial composed of officer and enlisted members convicted the appellant of making a false official statement and of making and uttering 13 bad checks in violation of Articles 107 and 123a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 907, 923a. The court sentenced him to confinement for 5 years, forfeiture of all pay and allowances, reduction to pay grade E–1, a dishonorable discharge, and a $6,000 fine, with the additional provision that if the appellant did not pay the fine, that he serve an additional year of confinement. The action of the convening authority, taken by an officer other than the one who convened the court, approved the sentence as adjudged except for the enforcement provision for nonpayment of the fine.

On appeal to this Court under Article 66(c), UCMJ, the appellant raises six assignments of error.[1] Having examined the record of trial and the briefs of the parties and having considered their oral arguments, we have concluded that no error prejudicial to the substantial rights of the appellant was committed. Therefore, we affirm. Our rationale follows.

*Factual Background*

Based on available evidence, authorities at the Marine Corps Air Station, El Toro, California, suspected that the appellant, Lance Corporal Arbuckle and Private Jepsen were involved in a scheme to pass bad checks at

1. I. THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE APPELLANT IN HOLDING THAT THE GOVERNMENT HAD MET ITS BURDEN OF SHOWING THAT APPELLANT'S COMPELLED STATEMENTS WERE NOT USED IN ITS PROSECUTION OF APPELLANT.

II. THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE APPELLANT WHEN HE FAILED TO RECUSE HIMSELF AFTER REPEATEDLY COACHING THE GOVERNMENT ON HOW TO MEET ITS BURDEN UNDER *KASTIGAR V. UNITED STATES.*

III. THE MILITARY JUDGE ABUSED HIS DISCRETION IN DENYING APPELLANT'S MOTION FOR A MISTRIAL WHEN THE COURT–MARTIAL FELL BELOW QUORUM AFTER SUBSTANTIAL EVIDENCE HAD BEEN PRESENTED ON THE MERITS.

IV. THE GOVERNMENT FAILED TO PROVE APPELLANT'S GUILT OF CHARGE II AND ITS SPECIFICATIONS BEYOND A REASONABLE DOUBT WHERE NO WITNESS COULD IDENTIFY APPELLANT AS THE PERSON WHO PASSED THE CHECKS, AND THE GOVERNMENT'S HANDWRITING EXPERT COULD NOT IDENTIFY APPELLANT AS THE PERSON WHO SIGNED THE CHECKS.

V. A SENTENCE INCLUDING A DISHONORABLE DISCHARGE, CONFINEMENT FOR 5 YEARS, AND A $6,000.00 FINE IS INAPPROPRIATELY SEVERE UNDER THE CIRCUMSTANCES OF THIS CASE.

VI. THE JUDGE ADVOCATE GENERAL OF THE NAVY'S PREPARATION OF NAVY–MARINE CORPS COURT OF MILITARY REVIEW JUDGES' FITNESS REPORTS VIOLATES APPELLANT'S RIGHT TO AN IMPARTIAL JUDICIAL FORUM. (CITATION OMITTED.)

various stores. These authorities initially planned to prosecute the appellant first and then Lance Corporal Arbuckle. As a result, the appellant's Article 32, UCMJ, investigation was held and the convening authority subsequently referred the charges against the appellant to trial by general court-martial on 5 November 1991. However, a ruling by the military judge to reopen the Article 32 investigation because of the absence of the appellant's civilian defense counsel thwarted the prosecution's plans. Therefore, the prosecution altered its strategy and decided to try to prosecute Arbuckle first. But the Government faced substantial problems with prosecuting Arbuckle due to the lack of evidence against him. In a last-ditch effort to uncover evidence against Arbuckle, the prosecution decided to grant immunity to the appellant and question him about his knowledge of Arbuckle's role in the criminal enterprise. Major General Blot, the convening authority, signed a grant of use immunity to the appellant on 26 November 1991. Appellate Exhibit XXV.

After the general had signed the grant of immunity, the trial counsel in the appellant's case, Captain Prew, was selected to interview the appellant. But before interviewing the appellant, Captain Prew was relieved of his duties as prosecutor. He spoke with the new trial counsel, Captain Delzompo, and turned over his prosecution file to him. Captain Poague was appointed as a new assistant trial counsel.

Pursuant to the grant of immunity, the appellant, along with his detailed defense counsel, met with Captain Prew on 27 November 1991. During the interview, the appellant exonerated Arbuckle, but generally implicated both Jepsen and himself in the check writing scheme. A second conversation between Captain Prew and the appellant took place a few days later by telephone. Captain Prew reported the information given to him by the appellant to Colonel Lucas, the air station staff judge advocate, Lieutenant Colonel Naugle, the air wing staff judge advocate, and Major Walker, the military justice officer.

Following the discussion with these officers, Captain Prew then spoke with Jepsen and communicated the appellant's statements to him. Jepsen later testified during an Article 39(a), UCMJ, session at the appellant's trial that, based on what Captain Prew had told him, his trial testimony against the appellant would not "change," but he would add more to it and would clarify it.

At either the end of November or the beginning of December, the Government decided to withdraw the charges against Arbuckle. This decision was made following a meeting between the convening authority, Lieutenant Colonel Naugle and Captain Prew. At this meeting, Lieutenant Colonel Naugle advised the convening authority that Captain Prew had spoken with the appellant and the outcome of any prosecution against Arbuckle was in doubt. Captain Prew said nothing during the meeting. There was no mention of the appellant's specific admissions, and Lieutenant Colonel Naugle believed that the decision to drop the charges against Arbuckle and the decision to prosecute the appellant were totally unrelated.

The appellant's second pretrial investigation hearing was held on 8 December 1991. Subsequently, the investigating officer submitted an addendum to his report on 17 December, again recommending trial by general court-martial. Lieutenant Colonel Naugle, the convening authority's staff judge advocate, also recommended trial by general court-martial in his Article 34, UCMJ, pretrial advice letter. The letter contained no express or implied mention of the appellant's immunized statements. On 27 December, the convening authority again referred the charges to trial by general court-martial. There is no evidence in the record that anyone communicated the appellant's immunized admissions of guilt to the convening authority at any time.

At an Article 39(a), UCMJ, session at trial, the defense made a timely motion to dismiss the charges based on the Government's alleged use of the appellant's immunized statements. The military judge held a pretrial hearing to allow the prosecution to establish that it had made no use of the appellant's immunized statements. The court heard the testimony of the Naval Investigative Service (NIS) special agent who investigated the

case. She testified that at the time Captain Prew interviewed the appellant, the investigation was basically complete with the exception of the writing of the final report. She had pursued all leads and had no further investigative actions pending. Colonel Lucas testified that Captain Prew had reported the results of the interview to him and that he had not discussed them with either Captain Delzompo or Captain Poague. Lieutenant Colonel Naugle then testified that Captain Prew also told him what the appellant had said and that he did not divulge those comments to either Captain Delzompo or Captain Poague. While he admitted that he had discussed some of the logistics of the case involving witnesses with Captain Delzompo, he never told him anything of what the appellant had said to Captain Prew.

During cross-examination of Lieutenant Colonel Naugle at the hearing, the defense counsel asked him to relate the exact substance of the appellant's immunized statement to the court. Captain Delzompo, the trial counsel, then left the courtroom in order to avoid hearing the answer and facing possible disqualification from the case. Captain Poague, the assistant trial counsel, remained in court and heard the substance of the immunized statement. He also heard it during Captain Prew's testimony after Captain Delzompo again had departed the courtroom while the substance of the appellant's statement was discussed. Jepsen also testified at this time, as summarized above.

The military judge granted the defense motion only insofar as excluding Jepsen as a witness in the case. He ruled that the Government would be required to show by a preponderance of the evidence that all of the evidence in the case was free from the taint or influence of the immunized statement. He proposed that the Government inquire of each witness prior to the witness' testimony whether he or she had heard of any statements made by the appellant and whether his or her testimony was based on an independent source.

The defense raised other specific concerns and objections related to the possible use of the appellant's statement. The first concerned the assistant trial counsel's role in

continuing to participate in the prosecution of the case after having heard the substance of the immunized statement. To address this, the military judge directed that officer to "keep [that immunized statement] to yourself, do not pass it on to Captain Delzompo," and that should it later appear that the statement was being used at trial, the matter would be revisited. Record at 187. The defense then inquired:

> ... is the court condoning the fact that we now have a member of the trial team who's been privy to the immunized statements of my client, it's sufficient and okay for him to sit at counsel's table? Is that the court's finding?
>
> MJ: It appears to be. You may call your next witness.

*Id.* Captain Poague remained at counsel table for the duration of the trial and conducted the examination of six witnesses, three during a suppression motion, and the rest on the prosecution's case in chief. The defense also objected to the continued participation of Captain Delzompo in the case and the action of the convening authority referring the charges to trial on 27 December after having been briefed by his staff judge advocate who knew the substance of the immunized statements.

During the prosecution's case, every witness' testimony was preceded by an Article 39(a) session outside of the presence of the court members in which the witnesses all said they were testifying from their own recollection of events and not from anything the appellant had said. The military judge entered special findings that there was no evidence that Captain Delzompo had been exposed to the contents of the appellant's immunized statements, that the order to Captain Poague not to discuss or divulge his knowledge of the statements to Captain Delzompo resolved Captain Poague's exposure, and, at the conclusion of the trial, that the prosecution had made no use of the appellant's immunized statements. Record at 315–17; Appellate Exhibit LXX.

### The Kastigar Issue

On appeal, the appellant argues that the Government made indirect and nonevidentia-

ry use of his immunized statements. He alleges indirect use in Captain Delzompo's contacts with Captain Prew and Captain Poague's continued participation in the trial. He alleges nonevidentiary use in Lieutenant Colonel Naugle's contacts with Captain Delzompo, and the convening authority's 27 December decision to again refer the appellant's charges to court-martial. He does not argue that the prosecution made any direct use of the statements, and, based upon our review of the record, we agree with him that there was no direct use. The military judge painstakingly avoided any direct use by the pretestimonial inquiry of all of the witnesses to ensure that their testimony was not influenced by and was independent of the appellant's immunized statements. The Government's position is that the prosecution did not make any use, indirect or nonevidentiary, of the appellant's immunized statements.

█ In *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the Supreme Court held that the prosecution may not use testimony that is compelled by a grant of immunity. The objective of "immunity from use and derivative use" of such compelled testimony is to "leave[ ] the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege in the absence of a ... grant of immunity." *Id.* at 458–59, 92 S.Ct. at 1663, quoting *Murphy v. Waterfront Commission,* 378 U.S. 52, at 79, 84 S.Ct. 1594, at 1609, 12 L.Ed.2d 678; *United States v. Gardner,* 22 M.J. 28 (C.M.A. 1986). In the military, this protection extends not only to direct use, but also to indirect and nonevidentiary uses, and the Government may not prosecute unless it is able to prove, by a preponderance of the evidence, that it did not use the immunized testimony against the appellant, either directly or indirectly, and that the prosecutorial decision was untainted by the immunized testimony. *United States v. Olivero,* 39 M.J. 246 (C.M.A.1994); *Cunningham v. Gilevich,* 36 M.J. 94 (C.M.A.1992); *United States v. England,* 33 M.J. 37 (C.M.A.1991); *United States v. Kimble,* 33 M.J. 284 (C.M.A.1991); *United States v. Boyd,* 27 M.J. 82 (C.M.A. 1988); *see also, United States v. North,* 910 F.2d 843 (D.C.Cir.), *modified in part,* 920

F.2d 940 (1990), *cert. denied,* 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991). While the Government could make its case more easily where it "catalogues" or "freezes" its evidence, such is not required to meet the demands of *Kastigar. England* at 39.

The Court of Military Appeals has suggested several factors to consider in deciding whether the Government's evidence against an appellant was obtained from a source wholly independent of appellant's immunized testimony:

(1) Did the accused's immunized statement reveal anything the Government did not previously know by virtue of the accused's own pretrial statement?

(2) Was the investigation against the accused completed prior to the immunized statement?

(3) Had the decision to prosecute the accused been made prior to the immunized statement? and

(4) Did the trial counsel who had been exposed to the immunized testimony participate in the prosecution?

*England* at 38–39, citing *Gardner* at 31.

█ In this case, we have concluded that the Government's evidence was obtained wholly independent of the appellant's immunized statements to Captain Prew. First, the appellant's immunized statements did not give the prosecution any additional information that it did not already have. His statement of culpability to Captain Prew was a plain and simple admission of involvement with no further specific details. In fact, it was virtually useless as a starting point for the discovery of additional information. The only use we can discern from it at all was the decision not to prosecute Arbuckle. It had no effect on the appellant's case. At the time of the immunized statements, the prosecution knew the identity of its witnesses and the substance of their testimony. The testimony of these witnesses, who were store employees, bank officials and experts on handwriting and fingerprinting, was not of a nature that was susceptible to influence by knowledge of immunized admissions.

Second, at the time the appellant made the immunized statements, the NIS investigation was basically complete in that all leads had been exhausted and no investigatory leads were pending. *United States v. Thevis,* 665 F.2d 616 (5th Cir.), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). All that remained to be done was to draft the final report. Also, the NIS agent assigned to the appellant's case transferred her investigatory file to Captain Delzompo the day before the appellant gave his immunized statement, and the agent testified at trial that she had no idea what the appellant and Captain Prew had talked about. Record at 129. Captain Prew also surrendered his prosecution case file to Captain Delzompo before he spoke to the appellant. We can find no use of the appellant's statements to improve and focus the investigation or perfect the Government's case.

Next, while a "decision to prosecute" the appellant was made after he gave his immunized statements, there was also a similar decision three weeks *before* he gave them. On 5 November 1991, the convening authority referred the case to trial. The immunized statements were given on and after 27 November. Because the pretrial investigation was reopened, requiring new recommendations from the investigating officer and the staff judge advocate, another decision to refer the charges was made. But we view this second referral as a reaffirmation of the earlier decision, particularly considering the similarity of the evidence presented at the two pretrial investigations. Nothing new concerning the appellant's case was presented to the general after the immunized statements to influence his decision to court-martial the appellant. There is nothing in the record to suggest that the decision to prosecute the appellant was made as a result of his immunized statements. *England.* We find that based on these facts, even though there was a decision to prosecute after the immunized statements were made, the Government established by a preponderance of the evidence that this decision to prosecute was not tainted by the immunized statements. *Olivero.*

Lastly, Captain Poague, the assistant trial counsel, who was exposed to the substance of the immunized statements, continued on the case and participated in the prosecution. Citing *United States v. McDaniel,* 482 F.2d 305 (8th Cir.1973), the appellant argues that Captain Poague's exposure to the statements and subsequent participation in the prosecution requires reversal because the Government did not prove that he did not make indirect uses of the information. In *McDaniel,* the prosecutor immersed himself in the defendant's immunized grand jury testimony prior to the filing of an indictment. At the time he read the transcript, he was unaware of the immunized nature of the testimony. The Court of Appeals did not hold that the prosecutor was disqualified *per se,* but merely held the Government had not sustained its burden of establishing that the prosecutor had not incorporated his knowledge of the immunized testimony by possibly "focusing the investigation, deciding to initiate prosecution, refusing to plea-bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy." 482 F.2d at 311.

The concerns that led the court in *McDaniel* to find subjective use of immunized testimony by a prosecutor are not present in this case. Captain Poague was not exposed to the immunized information until after the trial had commenced. Therefore, he could not have used it to focus the investigation (which had been completed), to decide to initiate prosecution (which was a matter within the discretion of the convening authority), or to refuse to plea-bargain (there is nothing in the record to indicate that the appellant ever attempted to strike a bargain in exchange for guilty pleas and he does not allege such at this time). Given the late stage at which Captain Poague learned of the content of the appellant's immunized statements, the fact that the Government's witnesses had already been discovered, its case prepared and its trial strategy developed, we cannot conceive of any way Captain Poague could have used the appellant's broad admission of guilt in any way. The appellant had not disclosed any information or leads that would have assisted the prosecution in its case against him by interpreting evidence or

planning cross-examination and trial strategy. Captain Poague had only learned that the appellant had admitted to involvement in the scheme. But the prosecution believed the appellant was guilty before he made his immunized statements, and his subsequent general admission of guilt added nothing to the case.

We have also closely examined Captain Poague's examination of the prosecution witnesses and we have found no indication that he may have tailored his questions based on his knowledge of the immunized statements. Because the defense presented no evidence at trial on the merits, he could not have used his knowledge of the content of the immunized statements to cross-examine any defense witnesses. While Captain Poague was also ordered not to divulge the substance of the immunized statements to Captain Delzompo,[2] the circumstances of this case, and not the order itself, are what convince us that he made no indirect use of the immunized statement. We therefore find that the Government sustained its burden in establishing that it did not use the immunized statements as a result of Captain Poague's exposure to them and his subsequent prosecutorial role. *United States v. Bianco,* 534 F.2d 501, 511 n. 14 (2nd Cir.1976) (rejecting defense assertion of error where prosecutor read the transcript of immunized testimony in preparation for defending against a defense motion to dismiss in a case where the investigation was complete and the prosecution case already prepared).

We also find no exposure of Captain Delzompo to the immunized statements. At the time of the disclosure in the courtroom, he had departed and did not hear them. All of the witnesses who testified on this issue stated that they said nothing of the substance of the appellant's immunized statements to Captain Delzompo at any time. Captain Prew turned over his prosecution file to Captain Delzompo before speaking with the appellant, as did the NIS agent with her investigatory file. The Government therefore sustained its burden with respect to Captain

Delzompo's possible use of the immunized statements as well.

■ While there were several potential problems created by the appellant's immunized statements becoming known to various officers, we are convinced that the Government made no use of the statements directly, indirectly or in a nonevidentiary manner. To hold otherwise in this case would be to virtually transform the appellant's use immunity into transactional immunity. However, the Government's burden under *Kastigar* is only to show by a preponderance of the evidence that the appellant was substantially in the same position as if he had exercised his Fifth Amendment rights. There is no *per se* prohibition that bars any knowledge of the statement. Even though the staff judge advocate and the assistant trial counsel knew what the appellant had told Captain Prew, the circumstances here disclose no use of the appellant's statements against him. This is all the protection the law affords the appellant and it was not violated in this case.

### The Military Judge's Impartial Role

■ The appellant also argues that the military judge abandoned his impartial role by coaching the trial counsel on how he had to meet his burden under *Kastigar*. In fact, after several instances in which the military judge made suggestions, the defense counsel challenged the military judge for cause, arguing that his impartiality was brought into question. The challenge was denied. Record at 342.

■ We find no error in the actions of the military judge in this regard. A military judge may make occasional suggestions and offer guidance or recommendations to counsel on how to proceed on a matter without abandoning his or her impartiality. *United States v. Payne,* 12 U.S.C.M.A. 455, 31 C.M.R. 41 (1961). The mere fact that such assistance is given does not make the military judge a partisan advocate. *United States v. Felton,* 31 M.J. 526, 531 (A.C.M.R.

---

**2.** Such an order cannot be given great weight in determining whether a prosecutor actually used immunized information. An appellant is not "dependent for the preservation of his rights upon the integrity and good faith of the prosecuting authorities." *Boyd,* at 85, citing *Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1663. *See also United States v. Rivera,* 1 M.J. 107 (C.M.A.1975).

1990). This is particularly true in a complex and unusual matter such as a *Kastigar* hearing where the military judge requires the prosecution to comply with its burden under the law. We must add, however, that there are situations when a military judge may go too far so as to lay aside the judicial cloak and improperly assume the role of part-time prosecutor. *See, United States v. Shackleford,* 2 M.J. 17 (C.M.A.1976); *United States v. Clower,* 23 U.S.C.M.A. 15, 48 C.M.R. 307 (1974). However, such did not occur in this case.

## The Mistrial Issue

After hearing the testimony of three witnesses during the prosecution's case, the military judge granted a challenge for cause against one of the court members. This reduced the court below a quorum. Following the detailing of new members to the court,[3] they were read the opening statements of counsel and the testimony of the witnesses who had testified. The defense counsel objected to this procedure, asserting that it violated the appellant's right to confront the witnesses against him and that the reading constituted an impermissible reinforcement of the testimony. He moved for a mistrial, but the military judge denied the request.

■ Before this Court, the appellant argues that the denial of the motion for a mistrial was error and he points out that one of the witnesses whose testimony was read to the new members had testified that the person who wrote and uttered the check in her store had a "brownish" hair color similar to hers and was slightly taller. Obviously, the new members would not be able to use such testimony in their deliberations and compare it to the appellant's hair color if this witness' testimony was read to them and they never saw her. However, to overcome this problem, the military judge required the prosecution to recall this witness. She returned to the courtroom for what was called a "viewing" before the new members and was then excused. We conclude that this procedure resolved the problem raised by defense counsel with respect to this witness.

■ As for the larger question of the denial of the motion for a mistrial, the law is clear that the decision to grant a mistrial rests within the sound discretion of the military judge and his decision will not be reversed absent clear evidence of an abuse of discretion. Declaration of a mistrial is a drastic remedy and should only be granted where the circumstances demonstrate a necessity to terminate the trial to prevent a manifest injustice against the accused. *United States v. Dancy,* 38 M.J. 1 (C.M.A.1993); *United States v. Rushatz,* 31 M.J. 450 (C.M.A.1990); *United States v. Rosser,* 6 M.J. 267 (C.M.A.1979); *United States v. Jeanbaptiste,* 5 M.J. 374 (C.M.A.1978); *United States v. Clark,* 37 M.J. 1098 (N.M.C.M.R. 1993).

Article 29(b), UCMJ, 10 U.S.C. § 829(b), states:

Whenever a general court-martial, other than a general court-martial composed of a military judge only, is reduced below five members, the trial may not proceed unless the convening authority details new members sufficient in number to provide not less than five members. The trial may proceed with the new members present *after the recorded evidence previously introduced before the members of the court has been read to the court in the presence of the military judge, the accused, and counsel for both sides.*

(Emphasis added). Similarly, Rule for Courts–Martial 805(d)(1) prescribes the reading of prior testimony to new members, but also cautions in the *Discussion* following the rule that "[w]hen the court-martial has been reduced below a quorum, a mistrial may be appropriate."

■ In this case, we find that the military judge did not abuse his discretion in denying the motion for a mistrial. Only three witnesses had testified, and in order to respond to the defense's concern about their testimony being reinforced before the members, the

---

3. The military judge authorized an additional peremptory challenge to each side for the new members. *United States v. Carter,* 25 M.J. 471

(C.M.A.1988). The defense exercised its extra peremptory challenge against one of the new members. The prosecution did not.

**552**

military judge had the testimony read only to the new members, and not the full panel. Additionally, he required one of the witnesses to return to the courtroom so that the new members could view her height and hair color because she had compared these aspects of her person to those of the person who passed the check. In following the language of the UCMJ and Rule 805 strictly, we cannot find an abuse of discretion by the military judge. He handled the situation fairly and in accordance with the law. This was not a situation that called for a mistrial, and we find no merit in the appellant's argument of denial of confrontation under the Sixth Amendment.

*Remaining Issues*

The appellant argues in Issues IV, V, and VI that the prosecution failed to prove his guilt beyond a reasonable doubt, that his sentence is inappropriately severe, and that his right to an impartial judicial forum has been denied in light of the Judge Advocate General's preparation of fitness reports for the judges of this Court. We are convinced of the appellant's guilt beyond a reasonable doubt, particularly considering the expert handwriting and fingerprint testimony. *United States v. Turner,* 25 M.J. 324 (C.M.A. 1987). We have also concluded that the sentence is appropriate in this case. The final issue has also been decided adversely to the appellant's position. *United States v. Mitchell,* 39 M.J. 131 (C.M.A.1994), *cert. denied,* — U.S. —, 115 S.Ct. 200, 130 L.Ed.2d 131 (1994).

Accordingly, the findings and sentence, as approved on review below, are affirmed.

Senior Judge MOLLISON and Judge CLARK concur.